IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BIOVANT LLC d/b/a BIOVANTE, § | | |
| Plaintiff, § | | |
| § | | |
| V. § | | No. 3:23-CV-1525-X |
| § | | |
| BTI AG LLC, et al., § | | |
| Defendants. § | | |

### MEMORANDUM OPINION AND ORDER

On November 15, 2025, Biovante filed a motion to compel discovery against Defendants BTI Ag LLC ("BTI"), Mark Ma, and Al Toops. (Dkt. No. 136 ("Mot. Compel").) United States District Judge Brantley Starr referred the motion to the undersigned magistrate judge for hearing, if necessary, and determination. (Dkt. No. 138.) After additionally conferring on the motion, the parties filed a joint status report advising the Court of their ability to resolve certain matters by agreement and identifying remaining issues requiring Court determination. (Dkt. No. 143.) The Court held a hearing on those issues on December 20, 2024. (Dkt. No. 148.)

For the reasons explained below, Biovante's motion to compel is **GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

**A.    Biovante's allegations.**

This lawsuit arises out of business relationships that soured. Plaintiff Biovante sells biotechnology products to farmers. (Dkt. No. 51 ("Am. Compl.") ¶ 13.)

According to Biovante's amended complaint, Chris Masters and Mark Ma met around 2003 and arranged for the company that employed Masters at that time to sell products to Asialink—a company owned by Ma's father—for distribution in China. (*Id.* ¶ 14.)

Masters and Ma subsequently sought to work together to bring Asialink's products to the domestic market. (*See id.* ¶ 16.) Biovante alleges that their discussions culminated in "a partnership . . . between Ma and Masters." (*Id.* ¶ 16.) Masters created Biovante and became its CEO and sole member. (*Id.* ¶¶ 1, 14, 16.) The men agreed that Biovante would purchase biotechnology products from the Ma-associated company in China then "bottle[], label[], and package[ them] for sale exclusively under Biovante's name" for distribution in the United States. (*Id.* ¶ 16.) Biovante alleges that Masters and Ma agreed Biovante would be the first and "exclusive/sole carrier and supplier" of these biotechnology products in the United States. (*Id.* ¶ 17.) Biovante received the products from China at its facility in Missouri, and it developed a system to package them for distribution in the United States. (*Id.* ¶ 18.) From 2009 to 2012, Masters and Ma worked together to "present and promote" Biovante's products in America, and the company began experienced significant revenue growth as it gained prominence in its industry. (*See* Am. Compl. ¶¶ 17-18.)

At some point during or after 2015, Ma created BTI and secured property for a production facility in Sachse, Texas. (*See id.* ¶¶ 20-21.) Masters and Ma agreed that,

rather than having the biotechnology products manufactured in China, BTI would instead manufacture them in Texas and supply them to Biovante. (*Id.* at ¶ 21.) At the same time, Ma became integrated in Biovante's operations. While Masters drove the promotion, marketing, and sales of Biovante's products, Ma acted as Biovante's chief financial officer ("CFO"), was in charge of its financial records, and had access to its network of dealers, distributors, salespersons, and customers. (*Id.* ¶¶ 22, 23.)

The relationship between Masters and Ma deteriorated sometime around 2022. (*See* Am. Compl. ¶ 26.) According to Biovante, Ma sought to extract himself from the business by citing personal circumstances that Biovante alleges were untrue. (*Id.*) When Masters declined to end the business relationship, Ma began making changes to the arrangements between BTI and Biovante—such as by having BTI charge substantially higher prices to Biovante for its products—and attributed these changes to new BTI management over which he had no control. (*Id.* ¶¶ 27-28.)

Biovante alleges that Ma, joined by other defendants who were BTI employees, sought to form a new entity—"BioTech Innovations"—to cut out Biovante and sell the same products to Biovante's customers under a different name. (*Id.* ¶ 29.) Biovante further alleges that Ma and others engaged in a scheme to damage it by intentionally shipping incorrect orders and contaminated products under Biovante's name and by disparaging Biovante through false statements to its distributors and customers. (*Id.* ¶¶ 30-31.) As Ma brought BioTech to fruition, Biovante alleges, he persuaded customers to cancel orders for Biovante products by

telling them that Biovante was financially strapped and would go under in months. (*Id.* ¶ 32.) Biovante also alleges that Ma misused Biovante's confidential customer lists and "intentionally misappropriated other trade secret information[.]" (*Id.* ¶ 33.) Specifically, it contends that Ma, with the assistance of other defendants, "used his access to Biovante's system to access and steal Biovante's product formulas" and obtained Biovante's labeling specifications and design. (*Id.* ¶¶ 33-34.) Once Ma's new company was operational, Biovante alleges that he continued to disparage Biovante. (*Id.* ¶ 37.)

Biovante alleges several additional acts of malfeasance by Ma. Specifically, it alleges that Ma, acting as the company's CFO, transferred "hundreds of thousands of dollars, if not millions of dollars," from Biovante without any legitimate purpose and wrote himself more than $1.5 million in checks without any proper purpose. (Am. Compl. ¶ 38.) It contends that its efforts to assess the extent of Ma's financial improprieties have been hampered because Ma has blocked Biovante's access to its financial records by claiming his ownership of them. (*See id.* ¶ 38.) Biovante also asserts that Ma improperly used Biovante's resources to pay BTI's expenses, such as BTI's lease for the Texas facility (*id.* ¶ 20), salaries of BTI employees (*id.* ¶ 21), and soil testing reports used to sell products Ma's product to Biovante's customers (*id.* ¶ 39). Biovante further alleges that Ma received and refused to remit payments that customers made to Biovante and unlawfully used Biovante's employer identification number to obtain credit accounts for Ma's new company. (*Id.* ¶¶ 40-41.)

Biovante alleges several causes of action. Against Ma and BTI, it asserts claims for trade secret misappropriation; unfair competition; breach of fiduciary duty; conversion; violation of the Texas Theft Liabilities Act, Tex. Civ. Prac. & Rem. Code § 143.001 *et seq.*; fraud; business disparagement; tortious interference with contract and with prospective business relationship; and trademark infringement. (Am. Compl. ¶¶ 45-84, 92-116.) It asserts a claim of fraud by nondisclosure against Defendants Ma, BTI, Valko, and Nyugen, and it names Defendants Toops, Gorman, Valko, and Nguyen in claims of conspiracy related to these substantive claims. (*Id.* ¶¶ 50, 56, 60, 65-66, 71, 77, 84-91, 91, 105, 110, 116.)

B.   **The instant discovery dispute.**

Biovante filed its motion to compel seeking an order requiring Defendants Ma, BTI, and Toops to provide adequate responses relating to a host of discovery. (*See* Mot. Compel.) The Court ordered the parties to engage in additional conference when it became apparent that the parties had not exhausted their ability to reach agreements through meaningful conference. (Dkt. No. 140.) The parties did so, and they were able to narrow the disputes between them. They subsequently filed a joint status report identifying two areas that remained in dispute and required court intervention. (Dkt. No. 143.)

With respect to the first item in dispute, the parties reached an impasse concerning Biovante's request that Ma and BTI disclose the formulas for products sold by BTI. BTI maintains that its product formulas are closely guarded trade

secrets that Biovante has never possessed and are irrelevant to the claims in this litigation, and it argues that its highly secret information would be seriously jeopardized by disclosure, even under the protective order that has been entered in this case.  Biovante contends that it participated in the development of those formulas and therefore has an ownership interest in them based on the "partnership" between Masters and Ma.  The second matter concerns Biovante's request for a native copy of BTI's QuickBooks file for 2014 to 2024.  Biovante asserts that discovery of the native file is appropriate to prove its allegations of financial malfeasance by Ma and damages pertaining to multiple claims.  Defendants posit that disclosure of the file should not be required because it would reveal the identities of BTI's distributors, raw material suppliers, and customers, and it would disclose BTI's volume of business, pricing, and other sensitive information.

## II.  LEGAL STANDARDS

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  And, under Fed. R. Civ. P. 37(a)(3)(B), a party seeking discovery

may move the Court for an order compelling production of information when another party from whom discovery is sought fails to produce requested documents.

As the parties opposing discovery, Defendants shoulder the burden to show how the requested discovery falls outside the scope of discovery established by Rule 26(b)(1) or is otherwise objectionable. *See Hunsinger v. Alpha Cash Buyers, LLC*, No. 3:21-CV-1598-D, 2022 WL 1128730, at *1 (N.D. Tex. Apr. 15, 2022). "A district court has wide discretion to supervise discovery . . . and may limit discovery if it would be unreasonably cumulative, could be obtained more easily from a different source, is not proportional to the needs of the case, or if the burden or expense of proposed discovery outweighs its potential benefit." *ATC Media, LLC v. Michaels Stores, Inc.*, No. 3:22-CV-1416-N, 2023 WL 5538996, at *2 (N.D. Tex. Aug. 28, 2023).

### III. ANALYSIS

**A.    Product Formulas**

The Court first considers Biovante's requests to BTI and Ma seeking documents discussing or evidencing BTI's "purchase of biotechnologies, biological inputs, and other raw materials used in any way" in one of several identified products and documents "evidencing or discussing BTI's or Biotech's product formulas." (Dkt. No. 143 at 4.[1]) Although Defendants initially asserted boilerplate

---

[1] Biovant's motion identifies the relevant discovery as Requests for Production Nos. 35-38 to BTI and Requests for Production Nos. 29-32 to Ma. (Dkt. No. 143 at 4.)

objections to the requested discovery based on relevance and overbreadth, they now resist production of responsive information on the basis that it would disclose the product formulas used in BTI's or BioTech's products.

The parties do not dispute that the product formulas are bona fide trade secrets. At the hearing on the motion, Biovante explained its belief that it owns the product formulas. According to Biovante, it owns the product formulas developed during the Biovante/BTI partnership because the formulas were developed using Biovante resources. It also contends that the product formulas are relevant to proving its claims that Defendants are unfairly competing against Biovante by selling the same products that Biovante sells or was supposed to have exclusive rights to under their arrangement. Importantly, Biovante acknowledges that it never actually possessed the product formulas but argues that Ma "maintained" them on Biovante's behalf. Defendants, however, assert that Biovante has never known the formulas and represent that BTI employs strict compartmentalization to ensure that no one other than its CEO has access to the complete formula for any product.

Upon consideration of the relevant standards, the briefing, and arguments made during the hearing, the Court denies Biovante's motion to the extent it seeks an order compelling any defendant to produce information that would disclose the product formula for a product identified by the requested discovery. A fair reading of the amended complaint shows that Biovante plausibly alleges a working arrangement between Ma/BTI and Biovante by which Biovante repackaged and

distributed biotechnology products that were supplied by Ma/BTI. (*See, e.g.*, Am. Compl. ¶¶ 16, 18, 21.) Although the complaint alleges that Biovante "further develop[ed]" those biotechnologies (*see id.* ¶ 17), that unspecified allegation alone does not sufficiently provide reason for the Court to order Defendants Ma or BTI to disclose highly confidential trade secrets that Biovante has admittedly never possessed and does not know.

Biovante's argument that it owns the product formulas is not persuasive. Again, its argument is predicated upon cursory allegations that Biovante participated in some way to "further develop" the products that Ma/BTI supplied to it. Biovante's attempt to recast the product formulas as partnership property falls short because it does not allege facts necessary to show that a partnership was formed in the formal sense or that the partnership owned the product formulas.

Based on the facts alleged and arguments presented, the Court concludes that Biovante's request for the precise product formulas is not proportionate to the needs of this case or the burden and risk to Ma/BTI encompassed by disclosure of the product formulas. Biovante's motion to compel is denied in this respect.

**B.    QuickBooks Files**

The Court next addresses Biovante's motion to compel BTI to produce a complete copy of BTI's QuickBooks accounting files.[2] Biovante argues that the

---

[2] Biovant's motion identifies the relevant discovery as Requests for Production Nos. 41-51. (Mot. Compel. at 12.)

accounting records go "directly to merits" of its claims that Ma/BTI engaged in various kinds of financial malfeasance such as those pertaining to the use of Biovante resources to pay BTI's expenses. (Dkt. No. 143 at 13.) It contends that the records also are relevant to Biovante's claims that Ma/BTI sold products to other domestic customers during the period of the cooperative business relationship contrary to the agreement of exclusivity and to issues pertaining to damages. (*Id.*)

BTI objects to a complete production of its native QuickBooks files for reasons similar to its objection to producing product formulas and other sensitive business information. In BTI's view, producing the complete QuickBooks files would reveal the identity of BTI's distributors, raw materials suppliers, end-user customers, volume of business, and pricing information. (Dkt. No. 143 at 17.) At the hearing, Biovante and BTI represented that, if the Court rules that BTI must produce a copy of its QuickBooks files, these parties agreed that BTI could produce the files with information about its raw material suppliers redacted.

Upon consideration of the arguments and facts presented, the Court grants Biovante's motion in part. The financial records are relevant to Biovante's claims, particularly those pertaining to the alleged misuse of Biovante's resources and sales to customers other than Biovante during the period in which the two purportedly had an exclusive arrangement. Subject to the parties' agreement allowing BTI to redact the vendor identities and raw materials, the Court orders BTI to produce its QuickBooks files created prior to the filing of this lawsuit. To the extent Biovante

contends that information from BTI's financial records during this lawsuit are relevant to damages and disgorgement, the Court concludes that there exist alternative methods more proportionate to the needs of this case available to obtain that information.

**C.    Request for Expenses under Rule 37**

Biovante requests an order pursuant to Fed. R. Civ. P. 37(a)(5)(A) requiring Defendants to pay attorney fees associated with filing its motion to compel. (Mot. Compel. at 24-25.) Rule 37 provides that, when a motion to compel is granted, "the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). The rule further provides, though, that the court must not require payment of expenses if "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." *Id.*

In view of the Court's rulings on the motion, the Court finds that Defendants were substantially justified in their nondisclosure of the product formulas. *See Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:10-CV-2618-D, 2015 WL 4486756, at *8 (N.D. Tex. July 23, 2015) ("A party's discovery conduct is substantially justified

under Rule 37 if it is a response to a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action" (internal quotation marks omitted)). Additionally, it is the Court's conclusion after a careful review of the filings that much of the disputed presented in the motion was resolved by meaningful post-motion conference between the parties, when it appears the parties genuinely sought to resolve the matters to the extent possible without court intervention. (*See, e.g.*, Dkt. No. 143 at 17-23.) Under these circumstances, the Court concludes that an award of fees would be unjust. *See* Fed. R. Civ. P. 37(a)(5)(A)(iii). Biovante's request for payment of expenses is denied.

For the foregoing reasons, Biovante's motion to compel (Dkt. No. 136) is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED** on February 6, 2025.

_____
BRIAN McKAY
UNITED STATES MAGISTRATE JUDGE